UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X
ROSA ABREU,

                Petitioner,                09 Civ. 10276 (RPP)
                                                  S1 06 CR 102 (RPP)
       - against –

                                                  **OPINION AND ORDER**

UNITED STATES OF AMERICA,

                Respondent.
---------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

      On October 27, 2009, Petitioner Rosa Abreu filed a motion *pro se* pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct her sentence of 70 months imprisonment imposed by this Court on October 24, 2008 and entered on October 31, 2008, on the grounds of ineffective assistance of counsel at sentencing. On January 28, 2010, Petitioner filed a motion *pro se* to amend her § 2255 petition to add two more ineffective assistance grounds. The Government filed a memorandum of law in opposition on March 12, 2008 and Petitioner, by Cheryl J. Sturm, Esq., filed a reply memorandum on March 27, 2010. On May 21, 2010 Petitioner filed a declaration executed May 18, 2010. That declaration is rejected as untimely since it was filed more than 50 days after Petitioner's reply and had not been authorized by the Court.

### I. FACTUAL AND PROCEDURAL BACKGROUND

      The underlying indictment charged Natarajan R. Venkataram, Director of Management Information Systems ("MIS") for New York City's Office of the Chief Medical Examiner ("OCME") and the Petitioner, OCME's Director of Records, with

conspiracy to embezzle and to money launder over $13 million of OCME Funds.  The indictment contained additional substantive counts of embezzlement and money laundering.

**The Entry of a Guilty Plea**

On October 4, 2007, Venkataram pled guilty after receiving a <u>Pimentel</u> letter, but without an agreement with the Government, to all sixteen counts of a Superseding Indictment charging him with one count of conspiracy to commit embezzlement and money laundering in violation of 18 U.S.C. § 371, one count of embezzlement in violation of 18 U.S.C. § 666 (a)(1)(A) and fourteen counts of money laundering in violation of 18 U.S.C. §§ 1956 (a)(1)(B)(i) and 1956 (a)(2)(B)(i).

On October 23, 2007, Petitioner pled guilty after receipt of a <u>Pimentel</u> letter without an agreement with the Government, to Counts One, Two, Twelve, Thirteen and Fourteen of the Superseding Indictment charging her with one count of conspiracy to commit embezzlement and money laundering, one count of embezzlement and three counts of money laundering.  She was not charged in the additional counts of the Superseding Indictment.

On January 17, 2008, the Government submitted a sentencing memorandum for both Venkataram and Petitioner.  The Government requested a sentence for Petitioner under the Sentencing Guidelines based on a loss amount of $13 million, the amount of OCME funds embezzled.  Pursuant to United States Sentencing Guidelines ("U.S.S.G. or the "Guidelines") § 2B1.1, a base offense level of 6 was applied.  Pursuant to Section 2B1.1(b)(1)(K), because the amount of loss exceeded $7 million and was less than $20

million, an increase of 20 offense levels was added and the following enhancements were requested:

1) Two offense levels because the offense involved a misrepresentation that the Defendants were acting on behalf of a governmental agency, OCME. U.S.S.G. § 2B1.1(b)(8)(A);

2) Two offense levels because the Defendants employed sophisticated means in committing the embezzlement. U.S.S.G. § 2B1.1(b)(9)(C);

3) Two offense levels because the Defendants abused a position of public trust to facilitate the offense. U.S.S.G. § 3B1.3;

4) Two offense levels because Abreu willfully obstructed or attempted to obstruct justice. U.S.S.G. § 3C1.1;

5) Two levels because the money laundering offenses of conviction were in violation of 18 U.S.C. § 1956. U.S.S.G. § 2S1.1(b)(2)(B);

6) Two levels because the Defendants employed sophisticated laundering. U.S.S.G. § 2S1.1(b)(3); and

7) No deduction for acceptance of responsibility pursuant to Guidelines Section 3E.1.1 because Abreu had obstructed justice and had not been forthcoming in identifying the present whereabouts of moneys embezzled and effectuating the return thereof.

Accordingly, the Government's position was that Ms. Abreu's sentence under the Guidelines should be 235-293 months of imprisonment. (Gov't Sentencing Memo dated January 17, 2008 at 54.)

**The Pre Sentence Report**

On August 22, 2008, the Probation Office issued a final Pre Sentence Investigation Report ("PSR"), calculating a Guideline sentence for Ms. Abreu as follows: Pursuant to U.S.S.G. Sections 2S1.1(a) and 1B1.5(b)(1), the offense level was calculated under Guideline Section 2B1.1. Accordingly, the base offense level was 6 and because the loss amount reasonably foreseeable to Ms. Abreu was between $7 million and $20

3

million, 20 levels were added pursuant to Section 2B1.1(b)(1)(K) and, because the Defendant used sophisticated means to embezzle, two offense levels were added pursuant to 2B1.1(b)(9)(c) for a total Base Offense Level of 28.  The PSR then added:  two offense levels pursuant to § 2S1.1(b)(2)(B) because Ms. Abreu was convicted under 18 U.S.C. § 1956; two levels pursuant to § 2S1.1(b)(3) because Guidelines subsection 2S1.1(b)(2)(B) applies and the offense involved sophisticated laundering; and two levels pursuant to § 3B1.3 because Ms. Abreu, as Director of Records for OCME, had abused a position of public trust, yielding an Adjusted Offense Level of 34.  The PSR took no position on the Government's request for a two-level enhancement for obstruction of justice under § 3C1.1 but did decrease the adjusted offense level by two levels pursuant to § 3E1.1(a) for acceptance of responsibility, leaving a Total Offense Level of 32 (PSR ¶ 67) and, since Ms. Abreu had no previous criminal history, recommended a sentence of 121 months total imprisonment (60 months on Count 1) (120 months on Count 2) and (121 months on Counts 12 to 14) convictions on all counts to be served concurrently (PSR Sentencing Recommendation, page 33).

On October 17, 2008, the Defendant submitted a 36 page Psychosocial Mitigation Report for sentencing purposes by Mark Silver, Esq., a mitigation expert, dealing with Ms. Abreu's social history and the impact of this case on her family.  In addition, on October 17, 2008, counsel for Ms. Abreu submitted a letter objecting to the Government's and the PSR Guideline calculations.  Specifically, defense counsel objected to the 20 level increase under 2B1.1(b)(1)(K), arguing that Ms. Abreu did not become involved with, or have knowledge of, the criminal conduct until late 2000 or early 2001, when she was asked to open corporations and to recruit family members to do

the same. (Letter of Lee Ginsberg dated October 17, 2008 at 1.) Defense counsel acknowledged that Ms. Abreu subsequently learned more about Mr. Venkataram's scheme and nevertheless continued her involvement. (Id.) Based on Ms. Abreu's later entrance into the fraudulent scheme, defense counsel requested the Court not to accept the Government's calculation of the amount of loss but to make a reasonable estimate of the "reasonably foreseeable" loss for which Ms. Abreu should be held accountable. Defense counsel's letter pointed out that U.S.S.G. § 1B1.3, Application Note 2 (2007), states a defendant's relevant conduct does not include the actions of members of a conspiracy prior to the defendant's joining the conspiracy and cited case authority for that position. In concluding this point, defense counsel stated "[t]he court must determine when Abreu joined the conspiracy, and based on that determination it should alter the 'loss amount' finding." (Letter of Lee Ginsberg dated October 17, 2008 at 1-2.) Defense Counsel also asked for a minor role adjustment for Ms. Abreu, indicating that Mr. Venkataram, Muhammed Naseh and D.V.S. Raju played greater roles in the overall fraud. (Id. at 2-3.) Defense counsel also objected to the two-level upward adjustment requested by the Government for obstruction of justice, asserting there was insufficient proof to show Ms. Abreu's intention to obstruct justice as opposed to faulty memory. (Id. at 3.)

By letter dated October 23, 2008, the Government addressed defense counsel's sentencing submission, pointing out that under U.S.S.G. Section 1B1.3(a)(1)(B), the standard established by the United States Sentencing Commission, a co-conspirator shall be held accountable for "all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity, " United States v. Greenfield, 44 F.3d

1141, 1149 (2d. Cir. 1995), and that Defendant bears the burden of demonstrating "lack of knowledge and lack of foreseeability," United States v. Martinez-Rios, 143 F.3d 662, 677 (2d. Cir. 1998). The Government also objected to the defense request for a minor role adjustment, arguing that Ms. Abreu played an essential role in the creation and operation of the shell companies, and also argued for a two-level obstruction of justice enhancement. (Letter of the Government dated October 23, 2008 at 5-8.) It also took the position Ms. Abreu had not fully accepted responsibility for her crimes and thus was not entitled to any deduction from the adjusted offense level under Section 3E1.1. (Id. at 8.)

**The Fatico Hearing**

At the Fatico hearings conducted by the Court on March 21, 2008 and July 11, 2008, the evidence in this case established that from 1999 through September 2005, two employees of OCME, Natarajan R. Venkataram, Director OCME's Management Information Systems and Rosa Abreu, OCME's Director of Records and primary assistant to Venkataram in the MIS Department, managed to divert over $13 million in OCME funds for their own use and that of their co-conspirators.[1]

Venkataram managed to convince co-conspirator, Muhammad Naseh, principal of Comprehensive Computer Resources ("CCR"), Infotech Partners ("Infotech") and HS Group, to contract with OCME to provide OCME with computer services, which Naseh's companies were not equipped to perform and never performed, but for which they billed and were paid. Eighty-five percent of these companies' receipts were channeled to companies formed and controlled by Venkataram and/or Abreu or directed for Venkataram's own use. Venkataram caused OCME to award contracts to Naseh's companies by directing the contracts to be awarded to a Naseh company or, when

---

[1] After September 11, 2001, the OCME received FEMA funds.

competitive bidding was required, by rigging the competitive bids of the Naseh companies. The largest contract was awarded to CCR on an emergency basis to identify victims' remains following the 9/11 attack on the false basis that CCR was familiar with OCME's computer systems. $11.4 million was paid to CCR under that contract. (Transcript of July 11, 2008 Hearing at 23-31; GX 80.)[2] Naseh, who has cooperated with the Government, has admitted that he and Venkataram agreed in the vast majority of cases that his companies would supply no service but would be paid in full. Under the arrangement, Naseh received 10-15% of the amount OCME paid to CCR, Infotech or HS Group and Venkataram controlled the remainder.

In 1999, at the beginning of the scheme, Venkataram directed Naseh to issue CCR checks to Hector Ortiz. Ortiz owned a small construction company and served as pastor of a church on the lower east side of Manhattan attended by Abreu and her family. After issuing these checks, Naseh provided them to Venkataram and between May 1999 to in or about January 2000, Venkataram and Abreu deposited 23 CCR checks totaling $70,706 into Ortiz's bank account at Apple Bank without Ortiz's knowledge. (Transcript of March 21, 2008 Hearing ("3/21/08 Tr.") at 21-26; PSR ¶ 41.) Ortiz shared the account with a woman named Maria Ordonez, who assisted Abreu in depositing the checks and then withdrawing the stolen money from the account, also without Ortiz's knowledge. (PSR ¶¶ 41-42.) Ms. Ordonez was a friend and co-worker of Abreu's mother at a luggage factory in Brooklyn. (PSR ¶¶ 42.)

Between March 2000 and May 2002, Venkataram and Abreu formed three shell check companies named A&D Marketing Corp., Trade A2Z Inc. and Infodata Associates

---

[2]   "GX" refers to Government Exhibits presented during the <u>Factico</u> hearing conducted on March 21, 2008 and July 11, 2008.

Corp. (PSR ¶ 43.) They arranged to have two of Abreu's relatives, her aunt Gisela Abreu and her then stepmother Araceleis Abreu, and a childhood friend of Abreu's, Luis Ney Gonzalez, open bank accounts in the names of the companies and serve as signatories on those accounts. (Id.) Abreu maintained control of the checkbooks. None of these companies had any employees or conducted any business.

After the Naseh companies received OCME payments, Venkataram would instruct Naseh to issue checks from those companies to A&D Marketing, Trade A2Z or Infodata in dollar amounts determined by Venkataram or to provide signed blank checks which Venkataram would issue to A&D Marketing, Trade A2Z or Infodata, which were then deposited in those companies' bank accounts set up by Abreu and her relatives and friends. Pursuant to this arrangement, from July 2001 to July 2003, A&D Marketing received approximately $648,484; from April 2000 to December 2002, Trade A2Z received approximately $597,241; and from March 2004 to July 2005, Infodata received approximately $97,600. (PSR ¶ 44.) These receipts total approximately $1.3 million. From these deposits, Abreu and the account signatories made cash withdrawals totaling $544,179 and transferred approximately $532,775 outside the United States by money remitting businesses. (Id.) The balance of those deposits was withdrawn for personal expenses, including credit card bills, premiums on a life insurance policy on the life of Luis Ney Gonzalez for $500,000 on which Venkataram was the beneficiary, utility bills and transfers to Venkataram's personal investment accounts at Morgan Stanley Dean Witter and Fidelity Investments. (Id.; 3/21/08 Tr. at 35-45.)

Venkataram also laundered stolen OCME funds through various legitimate companies[3] using checks issued at his direction by Naseh drawn on the accounts of CCR, Infotech or HS Group. None of these legitimate companies provided any goods or services to CCR, Infotech or HS Group or to OCME, with the exception of IT Streams, which, at CCR's direction, provided some services to OCME, but not to the extent reflected in the payments by OCME to CCR. Naseh's checks drawn to Afshin Enterprises and Farah Enterprises were used by Venkataram to purchase a Taco Bell and Pizza fast food restaurant in Queens. (PSR ¶ 46.) At Venkataram's request, most of the other legitimate businesses remitted cash or checks to Venkataram or to two companies he owned, Reliable Services and Products, Inc. and Reliable Health Services. The total amounts of OCME funds Venkataram laundered through legitimate businesses totaled approximately $1.6 million. (PSR ¶ 45.) Vankataram also formed a shell company called Visualsoft Corporation and recruited Shri Sharma to open a bank account for it in March 20004 and to service three ATM machines. (PSR ¶ 38; 3/21/08 Tr. at 151-54.) Visualsoft Corporation had no computer capability but received over $97,000 in OCME funds under a computer services contract. (PSR ¶ 38; 3/21/8 Tr. at 153-54.)

In addition, Venkataram had Naseh make 20 wire transfers for him to a company called Visualsoft Technologies, Ltd. in Hyderabad, India, a publicly held corporation in India, in an effort to purchase an interest in that corporation, but which resulted in his purchase of a share in a seaport development project in Gangavaram, India. These wire transfers totaled $6.12 million. (PSR ¶ 47; 3/21/08 Tr. at 129-40.) Visualsoft Technologies issued false invoices to CCR for work at OCME which had neither been

---

[3] Afshin Enterprises, Inc., Farah Enterprises, Inc., IT Streams, Inc., Paragon Advance Technologies, Inc., Eyork Consulting Inc., Cardinal Limousine, Inc., Wireless Stop, Inc., SGS Business Services, Inc. and Sawhney Trading, Inc. (PSR ¶ 45.)

9

requested of Visualsoft Technologies nor performed. (PSR ¶ 47.) Furthermore, in August 2005, after being interviewed by the City investigators, Venkataram wire transferred almost $1.1 million to India. (PSR ¶ 48.)

## II. DISCUSSION

Petitioner brings her motion pursuant to 28 U.S.C. § 2255. In a petition pursuant to § 2255, the Petitioner must demonstrate that the sentence was imposed in violation of the Constitution of the United States, or that the Court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximums authorized by law, or is otherwise subject to collateral attack. 28 U.S.C. § 2255; United States v. Addonizio, 442 U.S. 178, 185 (1979). Nonetheless, if a defendant shows that there is a reasonable probability the result of the proceeding would have been different but for counsel's unprofessional error, the Court should grant the petition. Strickland v. Washington, 466 U.S. 668, 693-94 (1984). Here there is no showing of ineffective assistance of counsel.

In her Section 2255 motion, Petitioner's first ground of complaint is that she was denied effective assistance of counsel at sentencing because her counsel:

> failed to properly advise me with respect to how the sentencing Guidelines would be applied to me and failed to challenge the manner and methodology by which the government and the District Court calculated the loss pursuant to USSG 2B1.1 and further, he failed to bring to the attention of the Court that fact that USSG 3B1.2 had been amended effective November 1, 2001 and that under the amended rules governing that Guideline – which should have been applied at the time of my sentencing – I was eligible for and should have received a downward adjustment for 'minor role' in accordance with Application Notes 3 and 4 of USSG 3B1.2. But, my counsel prevented Court from granting me minor role (Sent. motion page 3, Sent. Tr. at 61, 62) basing it on law that expired in November 2001.

(Amended Petition pursuant to 28 U.S.C. § 2255 dated January 28, 2010 ("Am. Pet.") at 5.)

Petitioner states "Being a lay person, I did not realize that the manner and methodology by which the Court determined loss under USSG 2B1.1 was wrong, until many months after my sentencing when I read a copy of my co-defendant's brief in support of his direct appeal." (Id.)

This ground of the Amended Petition is based on a failure to understand that Petitioner's sentence and her co-defendant's sentence were based on completely different methodologies with respect to the calculation of loss pursuant to U.S.S.G. § 2B1.1. In sentencing Petitioner's co-defendant (Venkataram), the Court utilized the full amount of the loss to OCME as set forth in Petitioner's Pre Sentence Report, paragraph 25, as well as in Venkataram's Pre Sentence Report – an amount which was proved in the Fatico hearings conducted on March 21, 2008 and July 11, 2008. Mr. Venkataram received a sentence of 180 months.

Petitioner's Pre Sentence Report recommended that the Court proceed to calculate the amount of the loss as the total amount of embezzlement of OCME funds attributable to the co-conspirators. See U.S.S.G. § 2B1.1(a)(2) (offense level of 6 plus a 20-level increase as the loss reasonably foreseeable to Petitioner was between $7 million and $20 million, U.S.S.G. § 2B.1(b)(1)(K)). (PSR ¶ 57.) The Government agreed with the calculation in the PSR. Defense counsel argued that this loss was not reasonably foreseeable to Petitioner as she did not know of her co-defendant's embezzlement until possibly 2001. (See Letter of Lee Ginsberg dated October 17, 2008 at 1-2; Transcript of Sentencing Hearing held October 24, 2008 ("Sent'g Tr.") at 8-18.)

11

The Court accepted defense counsel's position that there was no evidence before it as to when Petitioner became aware of Venkataram's agreement with co-conspirator Naseh. Accordingly, the Court found that Petitioner, who, together with her relatives, opened bank accounts for the shell companies A&D Marketing, Trade A2Z and Infodata, and was the keeper of the shell company checkbooks, was responsible for over $1.3 million of OCME funds received and disbursed from those entities' accounts. In view of Petitioner's role with respect to these transactions, totaling approximately $1.3 million, no minor role adjustment was appropriate. In view of defense counsel's having prevailed on the § 2B1.1. computation, his representation of Petitioner cannot be deemed ineffective in this regard.

> Petitioner's second ground is that she:
>
> did not receive effective assistance of counsel in connection with my decision whether to file a direct appeal of my sentence. When I consulted with my counsel concerning whether I should file a direct appeal, he told me that the manner by which the District Court determined loss under USSG 2B1.1 was proper, and that I had no valid grounds that would support a direct appeal of my sentence.
>
> (Am. Pet. at 6.)

As set forth in ruling on Petitioner's first ground, defense counsel prevailed on the loss amount calculation under U.S.S.G. § 2B1.1. The Court held Petitioner responsible for the losses of OCME funds which she knowingly received from the Naseh companies and which her relatives deposited in the bank accounts of the shell companies and disbursed at her direction for the benefit of herself, Venkataram and her co-conspirators.

Except for the loss amount and minor role adjustment issues raised, Petitioner brings her petition based on further reading her co-defendant Venkataram's brief on appeal. The arguments raised in Venkataram's appeal were denied summarily by the

Court of Appeals on December 16, 2009.  See United States v. Venkatarm, 356 F. App'x 541 (2d Cir. 2009).  Nevertheless, these grounds will be reviewed *de novo*.

>Petitioner's third ground is that she:

>did not receive effective Assistance of Counsel in defending the enhancement for Abuse of Trust – USSG 3B1.3.  Abuse of Trust in my case can only be applied if Money Laundry caused Abuse of Trust of OCME and not for my Embezzlement conduct.  This issue was raised by my codefendant "Venkataram" in his Direct Appeal brief and agreed by Government.  My Money Laundry using shells represented by family members as nominees did not abuse trust of OCME as none of the nominees knew about OCME or CCR.  Pursuant to Application Note 2(c) of USSG 2S1.1, computation under 2S1.1 cannot include Abuse of Trust a Chapter 3 enhancement based on Embezzlement conduct.  Abuse of Trust – 3B1.3 can only be applied under 2S1.1 if conduct in Money Laundry involved Abuse of Trust and Court Records show no abuse of trust in relation to Money Laundry.

>(Am. Pet. at 8.)

This argument loses sight of the facts that:  1) Petitioner held a responsible position at OCME as Director of Records and principal assistant to Venkataram in its MIS section; 2) Petitioner knew that OCME funds were used to pay CCR and that CCR (or other Naseh companies) were kicking back OCME funds, which she had deposited in the shell companies' accounts, opened by Luis Ney Gonzalez and her relatives; and 3) Petitioner also knew that the shell companies did no business with CCR or anyone else.  Thus, her action in laundering OCME's funds and hiding their source (OCME) was an abuse of OCME's trust in her.  Based on the admitted facts there were no arguments defense counsel could make that Petitioner's money laundering actions were not an abuse of the trust which OCME had placed in her.  Indeed, this argument by Petitioner raises a

question as to whether she truly has accepted responsibility under U.S.S.G. § 3E1.1 for the offenses for which she was convicted.[4]

Petitioner's fourth ground is that she:

> did not receive Effective Assistance of Counsel in defending the Enhancement for Sophisticated Means – 2B1.1(b)(9)(C). On reading my codefendant's Appeal Brief and government response, I realized it was Double Jeopardy to punish me twice for the same reason. The reasoning, facts supporting 2B1.1(b)(9)(C) are the same as given for Sophisticated Laundering 2S1.1(b)(3) which is for using Shells. My codefendant was given 2B1.1(b)(9)(C) for his bid rigging acts with Naseh, CEO of CCR. As the Court records indicate Mr. Naseh never communicated with me nor was I ever involved in any bidding to help Naseh companies. My only involvement in embezzlement was to expedite some payments from OCME and this was not Sophisticated.

(Am. Pet. at 9.)

The presence of "substantially overlapping enhancements" resulting in a high sentencing range may justify a downward departure. United States v. Abiodun, 536 F.3d 162, 170 (2d Cir. 2008) (citations omitted). But any such departure is discretionary, not mandatory. Id. (citing United States v. Kilkenny, 493 F.3d 122, 131 (2d Cir. 2007)).

The facts here are that the Petitioner knew that Naseh was receiving payments for computer services which were never received and was kicking back a significant portion of these payments to Venkataram and, as she admits, she knowingly took part in expediting payments to Naseh for services his company never performed. Petitioner does not deny she knew about Venkataram's bid rigging with Naseh, only that she did not take part in this. As a co-conspirator in this scheme, she is held liable under U.S.S.G. § 1B1 because of her participation in the sophisticated scheme by which funds were embezzled from OCME and because the other acts of her co-conspirator were known or reasonably

---

[4] In her Amended Petition, Petitioner argues that the Government's Pimentel letter is a contract with the Government (Am. Pet. at 15), which it expressly is not.

14

foreseeable to her.  U.S.S.G. § 1B1.3(a)(1)(B).  This embezzlement was sophisticated because it did not include just a taking of OCME funds by false payment entries by an employee.  It involved false contracts, falsifying MIS records, false invoices and the cooperation of outside parties, thus it was sophisticated.  See U.S.S.G. § 2B1.1, Application Note 8.  Sophisticated means and sophisticated laundering are two separate enhancements, independently authorized by the Guidelines, and whether the two enhancements are overlapping so as to justify a downward departure in the circumstances of a given defendant is a matter of discretion for the Court.

Petitioner's counsel at sentencing cannot be charged as ineffective with respect to the possibility of overlapping enhancements.  He advised the Court that the enhancement for sophisticated means in carrying out the embezzlement offense in conjunction with the sophisticated laundering enhancement was "akin … to double counting" and that he would argue it should be offset by some downward adjustment under 18 U.S.C. § 3553. (Sent'g Tr. at 64-65.)  In arguing the 3553(a) factors, defense counsel emphasized Ms. Abreu's background and personal characteristics, specifically her various hardships, that she was a good parent and daughter, argued that she had been a good employee at a job she had maintained since her arrest, and reiterated that her children and mother would suffer if she were incarcerated.  (Id. at 85-92.)

Petitioner's fifth ground is that she:

did not receive effective assistance of counsel due to the failure of my counsel to ask for downward departures to mitigate severe, harmful sentence resulting from overlapping enhancements.

(Am. Pet. at 16.)

15

Petitioner then argues: 1) that without enhancements she would have received a far lower sentence; 2) that the Second Circuit has approved a six-point downward departure in <u>United States v. Abiodun,</u> 536 F.3d 162, 170 (2d. Cir. 2008), and approved granting such downward departures in <u>United States v. Jackson</u>, 346 F.3d 22 (2d. Cir. 2003), and <u>United States v. Lauersen</u>, 362 F.3d 160 (2d. Cir. 2004);[5] 3) that she was a single mother who was supporting an elderly disabled mother whose livelihood depended on her justified downward departure, similar to the ten-level downward departure the Court approved in <u>United States v. Johnson</u>, 964 F.2d 124 (2d. Cir. 1992);[6] and 4) that her counsel failed to ask for downward departures for overlapping enhancements which was "clearly ineffective assistance." (Am. Pet. at 16.)

First, as stated above, Petitioner's counsel did advise the Court of the potential overlapping nature of the enhancements for sophisticated means and sophisticated laundering and provide written and oral presentations at sentencing, urging downward departures for family circumstances. Petitioner pled guilty to conspiracy to embezzle and to the substantive count of embezzlement; therefore U.S.S.G. § 2B1.1 applies with its enhancements. She also pled guilty to conspiracy to engage in money laundering in property derived from unlawful activity and three substantive counts of money laundering; therefore U.S.S.G § 2S1.1 and its enhancements applied under U.S.S.G. § 2B1.1. Each of the enhancements applied by the Court were separately authorized by the Sentencing Guidelines and Petitioner and her counsel in her reply brief have not provided any argument to support a finding that the Court's Guideline calculation was not

---

[5] <u>Lauersen</u> was vacated in light of <u>United States v. Booker</u>, 543 U.S. 220 (2005), by <u>Lauerson v. United States</u>, 543 U.S. 1097 (2005).

[6] In connection with the preparation of her PSR, Petitioner stated that her mother would care for her children if she were incarcerated. (PSR ¶ 74.) In <u>Johnson</u>, there was no one to take care of four children ages six and younger. See <u>Johnson</u>, 964 F.2d at 126, 129-30.

16

appropriate under the Guidelines.  Accordingly, Petitioner has not shown that her counsel at sentencing was ineffective based on Petitioner's fifth ground.

 Petitioner's sixth ground is that she:

did not receive effective assistance of counsel due to the failure of my counsel in defending the amount of <u>my gain</u> and this error caused a severe sentence.

(Am. Pet. at 17 (emphasis in original).)

 She argues that "[t]ranscripts, hearing of my co-defendant Mr. Venkataram show that <u>gain</u> was used to determine the sentence," that her counsel failed to show that her actual gain was less than $100,000, that her sentence was based on loss but had she correctly been sentenced on gain, her sentence would be based only on her gain and not on total gain to all defendants.  (<u>Id.</u>)  Petitioner argues that:  "My counsel's failure to understand that my sentencing should have been based on gain prevented my counsel from allowing Venkataram to testify."  (<u>Id.</u>)

 Petitioner's sixth ground is based on a misunderstanding of the Guidelines Section 2B1.1, which specifically states that the sentence computation should be based on loss to the victim.  Under § 2B1.1(b) the loss (as her counsel argued) had to be reasonably foreseeable pecuniary harm that the Defendant knew or reasonably should have known was a potential result of the offense.  U.S.S.G. § 2B1.1, Application Notes 3(A)(i) & (iv).  As for Petitioner's claims that her counsel could have requested Mr. Venkataram's testimony as to her amount of gain, there was no showing on the record that her counsel knew that Venkataram would testify on that subject.  His letter to the Court did not so indicate and in view of Venkataram's amorous relationship with

17

Petitioner,[7] her counsel, as a matter of trial strategy, could have reasonably concluded Venkataram's testimony and cross-examination would be more harmful to Petitioner than beneficial. Such decisions do not constitute ineffective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 689 (1984); Mason v. Scully, 16 F.3d 38, 42 (2d Cir. 1994).

Furthermore, after calculating Petitioner's sentence under the Guidelines as calling for a sentence of 70 to 87 months, the Court determined her sentence under the provisions of 18 U.S.C. § 3553(a) and concluded independently that because of the need to deter other city employees from abusing the trust placed in them by engaging in embezzlement and money laundering, a sentence of 70 months was sufficient but not greater than necessary in her case to achieve the purposes of 18 U.S.C. § 3553(a)(2). (Sent'g Tr. at 97-99.) Accordingly, even if Petitioner's counsel had been ineffective for the reasons she states (and he was not), such failure would not have caused her sentence to be different.

Ms. Abreu's Petition pursuant to 28 U.S.C. § 2255 is denied in all respects.

IT IS SO ORDERED.

Dated: New York, New York
       June 15, 2010

Robert P. Patterson, Jr.

U.S.D.J.

---

[7] By 1998-99, a personal relationship developed between Venkataram and Abreu in which he assisted her in the purchase of a co-op apartment for her and her two children and together they had contributed frozen embryos to an embryo bank and considered having children. (PSR ¶ 75.)

18

Copies of this order were sent to:

Rosa Abreu
Reg # 58511-054, Range-A/3
Federal Prison Camp – Alderson
P.O. Box A, Glenray Road
Alderson, W.V. 24910
(by mail)

Andrew S. Dember / Arlo Devlin-Brown
Assistant United States Attorney
One Saint Andrew's Plaza
New York, NY 10007
Fax: 212-637-0097
(by fax)

Cheryl Johns Sturm, Attorney at Law
387 Ring Road
Chadds Ford, PA 19317
Fax: 484-771-2008
(by fax)